# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**MEDA BITTERMANN and**
**DORU BITTERMANN,**

   Plaintiffs,

v.                   No. 18-cv-414 RB-KK

**RYAN ZINKE, SECRETARY OF THE**
**U.S. DEPARTMENT OF THE INTERIOR,**

   Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ms. Meda Bittermann and Mr. Doru Bittermann worked as volunteer campground hosts at the Rio Bravo Campground in Taos, New Mexico. They claim that their Bureau of Land Management (BLM) supervisors violated their civil rights. Ms. Bittermann alleges that she was subjected to ongoing sexual harassment. Both plaintiffs allege that they were fired in retaliation for complaining of the sexual harassment. Since the BLM is a division of the Department of the Interior, Plaintiffs sued Defendant Ryan Zinke in his official capacity as Secretary of the Interior. He argues that Plaintiffs' claims should be dismissed because they are not BLM "employees" and only employees can bring actions under Title VII of the Civil Rights Act of 1964. Having reviewed the submissions of counsel and relevant law, the Court will **deny** Defendant's Motion to Dismiss.

**I. Background**[1]

Plaintiffs worked as volunteer "Campground Hosts" at the Rio Bravo Campground within the Rio Grande del Norte National Monument in Taos County, New Mexico from April 1, 2016,

---

[1] The facts in this section are taken from Plaintiffs' Complaint (Doc. 1), and all well-pleaded factual allegations are presented in this section as true and construed in the light most favorable to Plaintiffs. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015). The Court recites only the facts and procedural background necessary to resolve this motion.

until September 13, 2017. (Doc. 1 (Compl.) ¶¶ 4, 16–17, 63.) In that role, Plaintiffs were responsible for "taking care of the campground by keeping it clean and in good operating mode; cleaning the bathrooms, showers and grills; and serving the needs of campers" as well as "greet[ing] campers and recreational users, and ensur[ing] fee and regulation compliance." (*Id.* ¶ 18.) Plaintiffs worked as campground hosts from 8:30 a.m. to 4:30 p.m. five days a week and were each paid $20.00 per day for their services, for a total of $100.00 per week. (*See id.* ¶¶ 19, 22.) Ms. Bittermann also worked eight hours per week at the Visitor Center, which involved "selling merchandise, keeping the area clean and assisting customers with directions, information and answering their questions, selling federal passes and conducting book sales." (*Id.* ¶ 20.)

As part of their contract as volunteer campground hosts, Plaintiffs were allowed to park their personal camper trailer at the campground for free, which would otherwise cost $15.00 per day. (*Id.* ¶ 23.) "Plaintiffs also received propane, electricity, and water/sewage for their camper trailer without charge, a[nd] regular campers were charged for such utilities." (*Id.*) Plaintiffs were allowed to use an official BLM vehicle and were reimbursed for mileage at the same rate as other BLM employees. (*Id.* ¶ 24.) Plaintiffs were given BLM uniforms, gloves, and other protective gear, and were insured for work-related injuries under the BLM's workers' compensation program. (*See id.* ¶¶ 25–26.) The BLM provided Plaintiffs with free training courses, including a CPR class, and Plaintiffs were also given passes to stay at other campgrounds for free. (*Id.* ¶¶ 27–28.)

"It was common practice for persons contracting with Defendant Agency to eventually become BLM federal employees" (*id.* ¶ 31), and Plaintiffs' supervisor and campground manager Randy Roch had promised Plaintiffs future employment (*id.* ¶¶ 29–30). Barry Weinstock was an assistant manager and was Ms. Bittermann's supervisor at the Visitor Center. (*See id.* ¶¶ 33, 35.) In June 2017, Mr. Weinstock began sexually harassing Ms. Bittermann, which included

unwelcome touching and hugging, making offensive sexual remarks and comments about Ms. Bittermann's appearance, and repeatedly inviting her out for drinks and creating situations in which Ms. Bittermann was forced to be alone with him. (*Id.* ¶¶ 36–47.) About a month after the sexual harassment began, Ms. Bittermann "in clear language told Weinstock that she was not interested in his sexual advances, that she was married, and that she and Weinstock were just working together." (*Id.* ¶ 48.) Mr. Weinstock then began complaining frequently that Ms. Bittermann was "always late," making offensive remarks about her accent and "workstyle," and yelling at her repeatedly. (*Id.* ¶¶ 49–60.)

Ms. Bittermann twice reported Mr. Weinstock's harassing and retaliatory behavior to Mr. Roch, and on September 5, 2017, met with Mr. Roch to again complain of Mr. Weinstock's behavior. (*Id.* ¶¶ 56, 61–62.) Mr. Bittermann was also present during this in-person meeting. (*Id.* ¶ 62.) Approximately one week later, Mr. Roch "came to talk to [Plaintiffs] and started the conversation with the words, 'I am here to ruin your day' and terminated both [Plaintiffs] on the pretext of 'complaints we received from people about your work.'" (*Id.* ¶ 63.)

Plaintiffs filed formal Equal Employment Opportunity (EEO) discrimination complaints—Ms. Bittermann's complaint alleged both discrimination on the basis of sex (sexual harassment) and retaliation, and Mr. Bittermann's complaint alleged retaliation. (*Id.* ¶¶ 7–8.) After receiving final agency decisions, Plaintiffs timely filed suit in this Court, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. (*Id.* ¶¶ 75–91.) Defendant has moved to dismiss the claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs have failed to state a claim for which relief may be granted because they "have failed to plead any facts to support the conclusory assertion that Plaintiffs, who admittedly worked as

volunteer Campground Hosts and received only insignificant benefits incidental to their Campground Host duties, were employees of Defendant." (*See* Doc. 13 at 3.)

## II. Legal Standard

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (internal citation omitted). "To survive a motion to dismiss," the complaint does not need to contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

## III. Analysis

Title VII of the Civil Rights Act of 1964 provides in relevant part that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). The Tenth Circuit has held that individuals bringing claims under Title VII must have "an employment relationship" with the defendant in order to maintain a valid claim. *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991). However, "employee" is defined in Title VII only as "an individual employed by an employer,"

*see* § 2000e(f), a definition the Supreme Court has described as "completely circular and explains nothing." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (describing an identical definition of "employee" in the Employee Retirement Income Security Act).

As a result, "[w]hether a plaintiff is an 'employee' for purposes of Title VII is a question of federal law" requiring additional analysis beyond the statutory definition. *See Williams*, 926 F.2d at 997 (citation omitted). The Tenth Circuit has joined the majority of circuits in employing the "threshold remuneration test" to determine when volunteers may be considered "employees" for federal employment purposes. *See McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 979 (10th Cir. 1998) (citing *O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997), *cert. denied*, 522 U.S. 1114 (1998)) (medical student was not an "employee" entitled to bring a discrimination claim under the Americans with Disabilities Act (ADA) because he received no remuneration from the medical school);[2] *see also Johnston v. Espinoza-Gonzalez*, No. 16-CV-00308-CMA-KLM, 2016 WL 7188524, at *4 (D. Colo. Dec. 12, 2016) ("The Tenth Circuit . . . has joined the Second, Fourth, Fifth, Eighth, and Eleventh Circuits in adopting a threshold-remuneration test for cases where the putative employee is not paid for his or her work.").

The threshold remuneration test requires a two-step inquiry to determine if a volunteer is an "employee" under federal law. First, the volunteer must prove that they receive remuneration for their work, which may take the form of "significant indirect benefits." *Juino v. Livingston Par. Fire Dist. No. 5*, 717 F.3d 431, 435–37 (5th Cir. 2013). "Remuneration may consist of either direct compensation, such as a salary or wages, or indirect benefits that are not merely incidental to the activity performed." *Id.* at 435. If the volunteer can show that they received remuneration for their

---

[2] Though *McGuinness* arose under the ADA, the requirement that a plaintiff demonstrate an employment relationship to maintain a discrimination claim under Title I of the ADA mirrors the employment relationship requirement for bringing discrimination claims under Title VII of the Civil Rights Act. *See McGuinness*, 170 F.3d at 979.

5

work, then the Court will employ the common-law agency test to determine whether an employment relationship exists, which involves analyzing various factors including but not limited to remuneration.[3] *See id.*; *see also Darden,* 503 U.S. at 323–24 (laying out factors to consider in the agency test); *Zinn v. McKune*, 143 F.3d 1353, 1357 (10th Cir. 1998) (same).

While the Tenth Circuit has adopted the threshold remuneration test, it has not explicitly defined how much remuneration, or what type, is necessary to move on to the second step of the inquiry. Thus, various cases in which other courts have analyzed indirect benefits under the threshold remuneration test are instructive. In *Juino*, the Fifth Circuit upheld a trial court's decision dismissing a Title VII sexual harassment claim because the plaintiff, a volunteer firefighter, had not shown sufficient indirect benefits to meet the first step of the threshold remuneration test. *Juino*, 717 F.3d at 439–40. There, the plaintiff received various benefits for her volunteer work including: "$2.00 per fire/emergency call; a life insurance policy; a full firefighter's uniform and badge; firefighting and emergency response gear; and firefighting and emergency first-response training." *Id.* at 439. During her time as a volunteer firefighter, the plaintiff responded to 39 calls and thus earned $78.00 in direct compensation. *Id.* The Fifth Circuit found that these benefits were "purely incidental to her volunteer service[,]" and thus the plaintiff had failed to show remuneration and was not an "employee" with the ability to bring a Title VII claim. *Id.* at 440.

In *Haavistola v. Community Fire Co. of Rising Sun*, the Fourth Circuit was faced with a similar question of whether a volunteer firefighter was an employee for purposes of a Title VII claim, and found that the issue hinged on disputed facts and was thus not appropriate for summary

---

[3] The Sixth and Ninth Circuits, rather than employing this two-part test, "view remuneration as only one, nondispositive factor in conjunction with the other common law agency test factors." *See Juino*, 717 F.3d at 435. Though Plaintiffs suggest the Court may also analyze their volunteer relationship with Defendant using the Sixth and Ninth Circuits' approach (*see* Doc. 17 at 7–9), the Court finds that the Tenth Circuit clearly adopted the threshold remuneration test in *McGuinness* and will not engage in the common-law agency analysis without a threshold showing of remuneration.

6

judgment. 6 F.3d 211, 213 (4th Cir. 1993). In *Haavistola*, the plaintiff was a volunteer firefighter who did not receive a salary, but did receive the following benefits for her service:

> [S]tate-funded disability pension; survivors' benefits for dependents; scholarships for dependents upon disability or death; bestowal of a state flag to family upon death in the line of duty; benefits under the Federal Public Safety Officers' Benefits Act when on duty; group life insurance; tuition reimbursement for courses in emergency medical and fire service techniques; coverage under Maryland's Workers Compensation Act; tax-exemptions for unreimbursed travel expenses; ability to purchase, without paying extra fees, a special commemorative registration plate for private vehicles; and access to a method by which she may obtain certification as a paramedic.

*Id.* at 221 (internal citations to state law governing benefits omitted). The Fourth Circuit found that the district court had erred in determining that, as a matter of law, the benefits described above precluded the plaintiff from being considered an employee for Title VII purposes. *Id.* The court reasoned that compensation and remuneration are not defined by either statute or caselaw, and thus whether the plaintiff's benefits rendered her an employee was a disputed question for the factfinder, not a question of law. *Id*. "The district court must leave to a factfinder the ultimate conclusion whether the benefits represent indirect but significant remuneration as [the plaintiff] contends or inconsequential incidents of an otherwise gratuitous relationship as the [defendant] argues." *Id.*

In *Pietras v. Board. of Fire Commissioners of Farmingville Fire District*, the Second Circuit upheld a trial court's decision following a bench trial that a volunteer firefighter was an employee for purposes of bringing a Title VII claim. 180 F.3d 468, 473 (2d Cir. 1999). In that case, a volunteer firefighter in training, described as a "probationary volunteer," brought a Title VII suit alleging sex discrimination in a physical fitness test that was required to become a full-time volunteer firefighter. *Id.* at 471. "Even as a probationary volunteer, [the plaintiff] was entitled to numerous firefighter benefits under state law and the by-laws of the department. These included:

7

(1) a retirement pension, (2) life insurance, (3) death benefits, (4) disability insurance, and (5) some medical benefits." *Id.* Comparing these benefits to those afforded to the volunteer firefighter in *Haavistola*, the Second Circuit found that the trial court had not erred in finding the plaintiff to be an employee. *Id.* at 473. The Second Circuit concluded "in accord with *Haavistola*, that a non-salaried volunteer firefighter's employment status under Title VII is a fact question when that firefighter is entitled to significant benefits. And we cannot say that the district court clearly erred in its finding that [the plaintiff] was, on this basis, an employee of the [fire] department." *Id.*

The Second Circuit has also held that participants in a mandatory welfare work program who received cash payments and food stamps equivalent to the minimum wage, reimbursement for transportation and child care expenses, and eligibility for workers' compensation had alleged significant remuneration sufficient to survive a motion to dismiss. *United States v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004). The Court explained that "the relationship alleged here—which includes the cash payment, the related benefits, and the requirement that the plaintiffs' work be useful—if proved, establishes the plaintiffs as employees for the purposes of Title VII." *Id.* at 97.

Though the Tenth Circuit has not addressed the sufficiency of various types of indirect benefits in satisfying the first step of the threshold remuneration test, district courts in the Tenth Circuit have shed light on the issue. In *Johnston*, 2016 WL 7188524, at *6, the plaintiffs were volunteer firefighters who did not receive direct compensation. However, they did get benefits for their work, including: eligibility for workers' compensation, funeral and death benefits, reimbursement of pre-approved expenses and off-site travel and training costs, tuition credits, discounted tires under a state procurement program, personal safety equipment and uniforms, radios and pagers for dispatch, and consideration for part-time or full-time employment. *See id.* In

denying a motion to dismiss much like the one before the Court in this case, the *Johnston* court explained that the plaintiffs had "listed sufficient benefits in the Amended Complaint to make it plausible that the 'the benefits represent indirect but significant remuneration.'" *Id.* (quoting *Haavistola*, 6 F.3d at 222). "Unlike in *Juino*, where the court found that the benefits 'were purely incidental to her volunteer service,' in this case, it is sufficiently plausible that, at least some of Plaintiffs' benefits were not just 'purely incidental' to their service as volunteer firefighters." *Id.* (quoting *Juino*, 717 F.3d at 440).

The *Johnston* court acknowledged that another trial court in the Tenth Circuit had previously reached an opposite conclusion on similar facts. *Id.* In that case, *Scott v. City of Minco*, 393 F. Supp. 2d 1180 (W.D. Okla. 2005), the court held that a volunteer firefighter had *not* proven sufficient remuneration to be considered an employee, even though the complaint alleged that volunteer firefighters received state pension contributions, tax credits, death benefits if killed in the line of duty, and an opportunity to purchase special license tags. *Id.* at 1183. The *Scott* court found that "[t]he line-of-duty benefits, although not completely irrelevant, are of no benefit to the firefighter unless injured or killed on the job. The chief financial benefits, therefore, are the tax credit and the pension benefit[,]" and there was no evidence that the plaintiff would have even been eligible to receive those two benefits. *Id.* at 1190. The *Johnston* court emphasized that *Scott* had been decided on a motion for summary judgment following discovery, and thus more evidence was available to the court in weighing the remuneration question. *Johnston*, 2016 WL 7188524, at *6. "In this case the parties have yet to engage in discovery regarding the scope of the benefits provided by the Fire Department to its volunteer fire fighters, and the cost and value of those benefits" but "even at this early stage, Plaintiffs have pleaded facts that, if proven true, could establish they received more significant benefits than the plaintiff[] in *Scott*." *Id.*

9

Here, the Court is persuaded that Plaintiffs have pleaded sufficient facts that, if true, could support a finding that Plaintiffs received remuneration for their work as volunteer campground hosts. Plaintiffs were eligible for workers' compensation benefits, as were the plaintiffs in *Haavistola*, *Johnston*, and *United States v. City of New York*—all cases where courts declined to find the plaintiffs were not employees as a matter of law. *See Haavistola*, 6 F. 3d at 221; *Johnston*, 2016 WL 7188524, at \*6; *United States v. City of New York*, 359 F.3d at 92. Some of the other alleged benefits, like the free camper trailer parking space valued at $15.00 per day and free utilities, appear to be fairly significant benefits but are also arguably incidental to the work as campground hosts. Determining if such benefits rise to the level of "significant indirect benefits" equating to remuneration is thus a factual question that, like in *Johnston*, will be better determined following further discovery regarding the scope and value of those benefits to Plaintiffs and the degree to which they are incidental to the job. *See* 2016 WL 7188524, at \*6.

While direct payments in the form of cash and food stamps that equaled the minimum wage were found to be part of a group of benefits amounting to remuneration in *United States v. City of New York*, 359 F.3d at 92, direct payments of $2.00 per firefighting call did not reach the level of remuneration in *Juino*, 717 F.3d at 439. Thus, while Plaintiffs' receipt of $20.00 per day from the BLM is not a salary and does not equal the federal minimum wage,[4] whether these daily payments, combined with Plaintiffs' other alleged benefits, are remuneration in the form of "significant indirect benefits" is a disputed question of fact that should not be decided on a motion to dismiss. *See Juino*, 717 F.3d at 437.

---

[4] Though Plaintiffs assert that these payments, combined with the value of their free camper parking space, equal the federal minimum wage, this is only true if both Mr. and Ms. Bittermann are credited the full value of the free parking space. (Doc. 17 at 10.)

10

Plaintiffs have also alleged that it was "common practice for persons contracting with Defendant Agency to eventually become BLM federal employees" (Compl. ¶ 31), and that Mr. Roch had promised Plaintiffs future employment (*id.* ¶¶ 29–30). The issue of whether potential future employment is an indirect benefit that may be considered remuneration has not been squarely addressed by any court in applying the threshold remuneration test, but the Equal Employment Opportunity Commission's (EEOC) compliance manual suggests that volunteers may be protected under federal employment statutes when "volunteer work is required for regular employment or regularly leads to regular employment with the same entity." EEOC Compliance Manual § 2-III(A)(1)(c) (citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 198 n.4 (3d Cir. 1994)).

While the Court need not decide here whether the promise of regular employment can be considered a form of remuneration, the fact that the EEOC appears to consider it relevant to the inquiry, combined with the fact that Plaintiffs allege that BLM volunteers were regularly hired as employees and that Mr. Roch had even promised them a job, demonstrates that the issue could benefit from further evidentiary development. The plaintiff firefighter in *Pietras*, whom the trial and appeals courts found to be an employee for Title VII purposes, was a probationary volunteer training to become a full-time firefighter. *See* 180 F. 3d at 471. And, in *Johnston*, the court listed "consideration for part-time or full-time employment" as an indirect benefit of the job before ruling that the issue of whether the plaintiff was an employee could not be properly decided on a motion to dismiss. *See* 2016 WL 7188524, at *6.

On the other hand, Plaintiffs have certainly alleged some benefits that may not be significant enough to be considered remuneration. Plaintiffs' BLM uniforms, protective gear, free training courses, and use of official BLM vehicles are benefits similar to those that the Fifth Circuit

11

found to be "purely incidental" to the plaintiff's volunteer work in *Juino*. *See* 717 F.3d at 440. Just as the plaintiff in *Juino* needed a firefighting uniform, protective gear, and trainings to adequately perform her job as a volunteer firefighter, Plaintiffs likely needed BLM uniforms, gloves, and other protective gear to identify them as BLM volunteers and to assist them in their cleaning and groundskeeping duties as campground hosts and, in Ms. Bittermann's case, at the Visitor Center. *See id.* While the CPR course and other trainings could potentially benefit Plaintiffs in unrelated situations, such trainings were likely offered specifically to prepare them to help campground guests in need of assistance.

Similarly, Plaintiffs did not receive any type of pension, life insurance, or medical benefits—benefits which were relevant to the court's holding that the plaintiff received remuneration in *Pietras*. *See* 180 F.3d at 471; *see also Haavistola*, 6 F.3d at 221–22 (reversing and remanding the trial court's decision that plaintiff was *not* an employee and noting that volunteer firefighters received a state funded disability pension and life insurance). Free passes to other campgrounds only benefit Plaintiffs and do not appear to have any relationship to successfully performing their volunteer duties, but their relative value and significance is likely quite low. Still, the true value of each of the indirect benefits described above and how they should be weighted in determining whether Plaintiffs received remuneration is far from clear.

Overall, Plaintiffs have laid out numerous benefits they allegedly received from the BLM for their work as volunteer campground hosts, and established precedent in this district does not make it immediately clear whether this combination of indirect benefits rises to a level comprising remuneration under the threshold remuneration test. Though some of these factual allegations lack specific detail and will require more development as discovery continues (*see, e.g.*, Compl. ¶ 31 ("It was common practice for persons contracting with Defendant Agency to eventually become

BLM federal employees), ¶ 30 ("Roch promised future employment to Plaintiffs")), the Court finds that the Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 570). As pleaded, it is plausible that the benefits afforded to Plaintiffs in return for their volunteer work could be considered remuneration, and that a subsequent analysis of the common-law agency factors under the second step of the threshold remuneration test could reveal that Plaintiffs were BLM "employees" entitled to bring their Title VII claims in this Court.

**THEREFORE**,

**IT IS ORDERED** that Defendant Ryan Zinke's Motion to Dismiss (Doc. 13) is **DENIED.**

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**