IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MEDA BITTERMANN and
DORU BITTERMANN,

      Plaintiffs,

v.                                                                   No. CIV 18-0414 RB/KK

RYAN ZINKE, Secretary of the
U.S. Department of the Interior,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Ms. Meda Bitterman and Mr. Doru Bitterman served as volunteer hosts at a New Mexico campground managed by the Bureau of Land Management (BLM). The Bittermanns each worked at least 40 hours per week, but as volunteers, they did not receive a salary or typical employment benefits. They did receive benefits, including a $20 per diem reimbursement stipend, usage of a camp site at the campground for their personal camper, free utilities (including electricity and propane), and more. Meda alleges that her supervisor sexually harassed her, and when she declined his advances, he retaliated against her. The Bittermanns contend that when Meda reported the harassment to her manager, the BLM terminated their volunteer contracts. Because the BLM is a division of the U.S. Department of the Interior, they filed suit against Ryan Zinke in his official capacity as Secretary of the Interior, alleging claims for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.

Zinke moves for summary judgment on several bases: as volunteers, the Bittermanns may not bring suit under Title VII; they failed to exhaust all of their claims; and they fail to establish their claims. The Court finds that there is a genuine issue of fact regarding whether, under the threshold remuneration test, the Bittermanns were volunteers or employees, and whether they had

1

sufficient notice of the EEO's timeliness requirements. Thus, their claims will move forward. Regarding the substantive claims, the Court will grant Zinke's motion with respect to the Bittermanns' retaliation claim based on their termination, but will deny the motion with respect to Meda's claim for sexual harassment and her retaliation claim involving Weinstock's conduct.

## II.      Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted).

## II.      Factual and Procedural Background[1]

### A.      The Bittermanns' Work as Campground Hosts

Meda and Doru Bitterman entered into Volunteer Service Agreements (VSAs) with the

---

[1] The Court recites all admissible facts in a light most favorable to the Bittermanns. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court recites only that portion of the factual and procedural history relevant to this motion.

BLM to serve as campground hosts for a campground in Pilar, New Mexico. (Docs. 52-A at 27:18–28:12, 33:19–34:12; 52-B at 28:12–29:9, 37:5–17, 43:10–22.) The VSAs were one-year agreements, but either party to a VSA could terminate the agreement at any time. (Doc. 52-C at 78:10–15.) The Bittermanns' duties included greeting campers, collecting fees, cleaning restrooms and campsites, answering questions from the public, and enforcing campground rules. (Docs. 52-A at 24:7–12; 52-B at 31:7–32:1.) Meda also regularly staffed the visitor center eight hours per week. (Docs. 52-A at 24:12–25:7; 52-D at 39:6–11.) The Bittermanns worked full-time as campground hosts: eight hours per day, five days per week. (Docs. 52-A at 46:1–10; 52-B at 29:21–30:1.) In practice, however, campground hosts worked "24/7," because they lived onsite at the campground and helped campground guests outside of their scheduled hours. (Docs. 52-A at 46:11–25; 52-B at 45:17–23; 52-C at 8:25–9:5.)

BLM volunteers did not receive a salary or other typical employment benefits such as annual or sick leave, health or life insurance, or retirement benefits. (Docs. 52-A at 30:10–31:14, 36:3–25; 52-B at 51:15–52:4; 52-C at 14:12–22.) The VSAs provided in part: "I understand that I will not receive any compensation for the above service and that volunteers are not considered Federal employees for any purpose other than tort claims and injury compensation. I understand that volunteer service is not creditable for leave accrual or any other employee benefits." (Docs. 52-A at 29:15–20; 52-B at 35:9–16.) Campground hosts did receive benefits, however, including: (1) a $20 per diem reimbursement stipend, amounting to $100 per week each (tax exempt); (2) a campground site to park their camper, worth $15/day or $5,475/year; (3) utilities at no cost, including electricity (at an estimated value of up to $300/month) and propane (at an estimated value of up to $100/month during the winter months)[2]; (4) use of a landline phone;

---

[2] Zinke disputes these amounts as "speculative and unreliable." (Doc. 59 at 6.) This objection goes to the weight rather than to the admissibility of the evidence, and the Court overrules it.

(5) reimbursement for gas mileage on their personal vehicle of .14/mile for work-related travel (whereas regular employees received .58/mile); (6) occasional use of a BLM vehicle; (7) BLM uniforms; and (8) coverage for work-related injuries or tort claims. (Docs. 52-A at 30:23–31:14, 32:17–20, 38:23–39:1, 39:22–40:5, 41:14–18; 52-B at 29:12–30:18; 52-C at 8:25–9:19, 10:22–13:3; 54-2 at 47:13–50:1.)

Randall Roch and Barry Weinstock acted as the Bittermanns' supervisors. (Docs. 52-A at 47:17–19.) Meda and Doru both testified that Roch promised to hire them as employees. (Docs. 54-1 at 54:8–21; 54-2 at 57:2–58:1.) Between 2014 and 2019, 15 BLM volunteers (including campground hosts) in the relevant area were hired as BLM employees in either temporary seasonal and/or "emergency hire" positions. (Docs. 54-1 at 55:9–25, 56:14–21; 54-4 at 2–3.) Weinstock had also previously served as a BLM volunteer. (Doc. 54-4 at 3.)

### B.  Meda's Claims of Harassment and the Bittermanns' Claims of Retaliation

Meda testified that Weinstock sexually harassed her on multiple occasions for approximately one month in June 2017, by: complimenting her "form-fitting" clothes; telling her sexually-related jokes; giving her hugs that were too long and unwelcome; seeking time alone with her; inviting her to accompany him on rafting trips or out for drinks; creating individual training sessions with her; encouraging her to "bend over more often"; standing close to her and peering down her blouse; standing in the doorway to block her exit; and touching her buttocks. (Doc. 54-1 at 63:16–69:20; 117:4–13.) Sometime around July 2017, Meda told Weinstock that she was not interested in his advances. (*Id.* at 71:10–72:9.) Meda testified that after this point, Weinstock's behavior changed: he began to fabricate reasons to report that she was not a good employee, criticize how she answered the phone, and make fun of her accent. (*Id.* at 79:12–80:7; 80:19–81:1, 116:17–117:3.) For example, Weinstock and Meda had a dispute on September 2, 2017, when

Weinstock stopped Meda and accused her of speeding, then continued to shout at her later at the visitor center. (*Id.* at 81:2–16, 82:1–13; 52-D at 32:6–33:25.) She asked him why, and he replied "that he doesn't take very well [to] rejection." [3] (Doc. 54-1 at 82:13–16.) He also yelled at her about backing into a BLM vehicle and breaking the tail light. (*See* Doc. 52-C at 59:24–19.)

Meda did not report the behavior to Roch or anyone else with the BLM in June or July 2017, because she was worried about retaliation and jeopardizing her position. (Doc. 54-1 at 72:16–21, 76:10–13.) On September 2, 2017, after the speeding incident, Meda emailed Roch and told him what had happened, describing Weinstock's communications with her as "really nasty." (Doc. 54-3 at 71:1–11.) Roch met with the Bittermanns on September 5, 2017, to discuss the speeding incident. (Doc. 52-A at 63:2–10.90:23–91:23.) At that meeting, Meda told Roch that Weinstock "really, really likes me." (*Id.* at 92:1–4.) Roch "took that this to mean that [Meda] thought [Weinstock] might have had a crush on her at one time . . . ." (Doc. 52-C at 63:6–14.) Meda testified that she had a second, private conversation with Roch after the September 5 meeting and gave him details about the sexual harassment.[4] (Docs. 52-A at 94:23–96:9; 54-1 at 100:4–8.)

### C. The Bittermanns' Termination and the BLM's Stated Reasons for Ending Their VSAs

During a meeting on September 10, 2017, Roch, his supervisor (John Bailey), and Sarah

---

[3] Zinke objects to Meda's testimony about the harassment and retaliation and asserts that her statements attributed to Weinstock are inadmissible hearsay. (Doc. 59 at 6–7.) But the statements—that Meda's clothes were "form-fitting," that she should "bend over more often," that he "doesn't take very well [to] rejection"—were "not offered for the truth of what was said[,] . . . but for the fact that it was said, that [Meda] heard it, and that it contributed to her perception of the workplace [environment]" as abusive. *See Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 752 (10th Cir. 2014). Zinke's objection is overruled. Moreover, Weinstock denies all of the allegations of sexual harassment and retaliation. (*See*, *e.g.*, Doc. 52-D at 32:6–33:25, 56:20–57:14.) The Court finds that there is a genuine issue of disputed fact regarding Meda's allegations of sexual harassment and retaliation and adopts Meda's version of the events for purposes of this motion. *See Liberty Lobby*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citation omitted).

[4] Roch testified that Meda never complained to him that Weinstock had sexually harassed her. (Doc. 52-C at 66:12–14.) The Court finds there is a genuine dispute of fact and adopts Meda's version of the events for purposes of this motion.

Schlanger (BLM Field Office Manager) made the collective decision to terminate the Bittermanns' VSAs. (*Id.* at 15:24–16:9, 39:24–40:8; *see also* Doc. 52-E ¶ 1.) Roch testified that he had called the meeting after he had received a "distressing" complaint from another BLM volunteer who said that two female campers reported to Meda that they felt threatened by other campers, but she declined to help because the Bittermanns were "off duty." (Doc. 52-C at 40:9–41:4.) The women asked Meda if they could use a telephone to call 911, and she said that she did not have a phone. (*Id.* at 40:25–41:1.) Roch also testified that he had received complaints about the cleanliness of the showers/restrooms at the campground, as well complaints from "[m]ultiple volunteer[s] and staff" "about Meda's tendency to arrive late for her visitor center shift."[5] (*Id.* at 26:6–23.) Weinstock testified that he witnessed Meda arriving late for her visitor center shifts, that Doru's campground upkeep was always below average, and that it took Doru two weeks to remove a large personal item stored in an equipment building after being asked. (Doc. 52-D at 24:8–22, 28:23–29:11, 47:15–24.) Zinke identified all of this conduct as reasons and/or bases for the Bittermanns' termination. (Doc. 54-4 at 4 (reasons included Doru's "failure to follow repeated directions from . . . Roch and . . . Weinstock, the expansion of [their] 'footprint' at [their] campsite, being unavailable when 'on-call,' and below average campground upkeep").)

On September 13, 2017, Roch met with the Bittermanns and informed them that the BLM's management had decided to terminate their VSAs. (Docs. 52-A at 103:20–24; 52-C at 74:11–76:11.) Roch told them that the BLM had received a number of complaints that they were not available to campers at the campground. (Doc. 52-C at 75:10–13.)

---

[5] The Bittermanns object to these statements—that Meda did not assist the female campers and that Meda arrived late for her shifts—as hearsay. (Doc. 54 at 3.) The Court finds, however, that Zinke has not submitted the statements to prove the truth of the matters therein, but only to show that the BLM management was aware of these complaints when it made the decision to terminate the VSAs. *See* Fed. R. Evid. 803(3); *see also Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434–35 (10th Cir. 1993) (evidence establishing employer's state of mind when terminating plaintiff's employment not hearsay).

Schlanger followed up with a letter dated September 29, 2017, and notified the Bittermanns "that your personal needs and our public needs are different enough that we will end your volunteer status and close out your volunteer agreements on or before November 1, 2017." (*See* Doc. 52-C at 18.) The Bittermanns entered into short-term VSAs with the BLM for the month of October 2017, which included the $20 per diem reimbursements, to allow them time to move their personal property off of the campsite. (*See id.*; *see also* Docs. 52-A at 60:1–61:8; 52-C at 83:12–24.)

### D.     EEO Proceedings

Meda initiated EEO counseling on September 21, 2017. (Doc. 52-F at 2.) The matter was not resolved through counseling and she filed a formal complaint on November 13, 2017. (*Id.*) She alleged in her complaint that: Weinstock sexually harassed her in June 2017; she rejected his advances, and he then began to retaliate against her, specifically by accusing her of speeding on September 2, 2017, and by yelling at her for cracking the tail light of a vehicle with her car on August 5, 2017; and that she was retaliated against when she reported the harassment to Roch on September 5, 2017 and he took no action, and when she was fired on September 13, 2017. (*Id.* at 1.) Meda's complaint was dismissed for failure to state a claim on the basis that she was a volunteer with the BLM, not an employee. (*Id.* at 2–3.)

Doru initiated EEO counseling on November 14, 2017. (Doc. 52-G at 1.) The matter was not resolved through counseling and he filed a formal complaint on January 30, 2018. (*Id.* at 1–2.) He alleged in his complaint that he was discriminated against based on a physical disability (a foot injury) and retaliation (termination on September 13, 2017, because of his wife's reporting of the harassment). (*Id.* at 1.) Doru's complaint was also dismissed on the basis that he was a volunteer. (*Id.* at 2–3.)

The Bittermanns filed their Complaint in this Court on May 2, 2018. (Doc. 1.) Zinke now

moves for summary judgment on all claims. (Doc. 52.)

**III. Analysis**

    **A. A genuine dispute of fact exists regarding whether the Bittermanns were volunteers or employees.**

The Bittermanns bring their claims under Title VII, which in relevant part prohibits employers from discriminating against "any individual . . . because of such individual's race, color, religion, sex, or national origin[,]" 42 U.S.C. § 2000e-2(a)(1), or "because he has opposed any practice made an unlawful employment practice by" Title VII," *id.* § 2000e-3(a). "Title VII protections apply only where there is some connection with an employment relationship." *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (quotation omitted). Zinke contends that the Bittermanns cannot bring their claims under Title VII because they were volunteers, not employees. The first question the Court must consider, therefore, is whether the Bittermanns—who signed agreements as volunteers with the BLM—may plausibly be classified as employees under Title VII.

Because the statutory definition of "employee" provides no guidance, *see* 42 U.S.C. §2000e(f), the Tenth Circuit uses the "threshold remuneration test" to determine when volunteers may be considered "employees" for federal employment purposes. *See Sacchi v. IHC Health Servs., Inc.*, 918 F.3d 1155, 1158 (10th Cir. 2019); *McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 979 (10th Cir. 1998). This test involves a two-step inquiry. First, the volunteer must prove that they receive remuneration for their work. *See Juino v. Livingston Par. Fire Dist. No. 5*, 717 F.3d 431, 435–37 (5th Cir. 2013). "[R]emuneration may consist of either direct compensation, [such as a] salary or wages, or significant indirect benefits[,]" such as a pension or insurance. *Id.* at 437. Whatever the remuneration, it must be "substantial or significant and not incidentally related to advancing the purpose of the putative employer." *Sacchi*, 918 F.3d at 1158 (citation

omitted). If the volunteer can show that they received remuneration for their work, then courts use the common-law agency test to determine whether an employment relationship exists. *See id.*; *Juino*, 717 F.3d at 435. Only the first step is at issue in Zinke's motion. (*See* Doc. 52.)

The Bittermanns received: (1) a $20 reimbursement stipend for each day they worked or approximately $5,200/year; (2) a campground site to park their camper, worth $15/day or $5,475/year; (3) utilities at no cost, which Doru estimates has a value of up to $400/month in the extreme hot or cold months; (4) use of a landline phone; (5) reimbursement for gas mileage at rate below that of regular employees; (6) occasional use of a BLM vehicle; (7) BLM uniforms; and (8) coverage for work-related injuries or tort claims. The value of the first three benefits creates a factual issue that requires submission of this question to the jury.

Zinke directs the Court to three cases analyzing whether volunteer firefighters were employees under the threshold remuneration test. (Doc. 52 at 11–13 (discussing *Juino*, 717 F.3d at 440; *Haavistola v. Cmty. Fire Co.*, 6 F.3d 211 (4th Cir. 1993); *Scott v. City of Minco*, 393 F. Supp. 2d 1180 (W.D. Okla. 2005)). The indirect benefits the volunteer firefighters received, however, such as life insurance, survivors' benefits, or disability pensions, are somewhat different from the relevant benefits the Bittermanns received as volunteers with the BLM. *See Juino*, 717 F.3d at 439–40 (finding no employee relationship where volunteer received $2.00 per fire/emergency call, life insurance, a uniform and badge, gear, and training); *Haavistola*, 6 F.3d at 221 (finding the question of whether volunteers were employees must go to the jury where they received a disability pension, survivors' benefits, scholarships for dependents on disability or death, group life insurance, training, workers' compensation, and more); *Scott*, 393 F. Supp. 2d at 1190–91[6] (finding no employee relationship where benefits were similar to those in *Haavistola*).

---

[6] The Court does not find *Scott* persuasive for three reasons. First, the *Scott* court recognized that its conclusion was "contrary to that reached . . . in *Haavistola* . . . ." *See* 393 F. Supp. 2d at 1190–91. But the Tenth Circuit cited to

9

More helpful here are the Second Circuit's decisions in *United States v. City of New York*, 359 F.3d 83 (2d Cir. 2004) and *York v. Association of Bar of City of New York*, 286 F.3d 122 (2d Cir. 2002). In *United States v. City of New York*, the plaintiff welfare recipients received cash payments, food stamps, transportation costs, child care expenses, and workers' compensation benefits in exchange for their participation in a welfare work program. 359 F.3d at 86, 92. "In order to calculate the number of hours a recipient may be required to participate in a work experience activity, New York divides the amount of assistance payable to the recipient including food stamps by the higher of the federal minimum wage or the state minimum wage." *Id.* at 88 (citation omitted). The Second Circuit held that the benefits, which depended on the plaintiffs' performance of work, were substantial and sufficient to survive a motion to dismiss. *Id.* at 92. Zinke counters that the sum total of the Bittermanns' remuneration does not equal the 2017 minimum wage, which necessitates a finding that they were not employees. (Doc. 59 at 10.) But Zinke points to no case that *requires* remuneration equal a minimum wage. Remuneration need only be substantial or significant. *See Sacchi*, 918 F.3d at 1158. Like the benefits in *United States v. New York*, the value of the per diem reimbursement and the free site/utilities here is significant enough to go to the factfinder.

In *York*, an attorney volunteered with her local bar association and, in return, was provided

---

*Haavistola* favorably in its most recent threshold remuneration decision. *See Sacchi*, 918 F.3d at 1158–59. Next, the *Scott* court explained that its decision was "more consistent" with "Congress's concern for 'protecting small enterprises from the hardship of litigating discrimination lawsuits.'" *Scott*, 393 F. Supp. 2d at 1191 (quotation omitted). The concern for "small enterprises" is inapplicable to the BLM. Finally, the *Scott* court relied on language from an older Tenth Circuit case finding that volunteer union stewards had not shown facts sufficient to find an employment relationship where the stewards received only "isolated reimbursement[ payments] for lost time." *Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1152 (10th Cir. 2002). The court in *Scott* emphasized the Tenth Circuit's mention of *payments*, presumably to show that the Tenth Circuit values monetary payments over indirect benefits. *See* 393 F. Supp. 2d at 1191. But the Tenth Circuit explicitly held in *Sacchi* that volunteers can establish employment relationships by showing that they received substantial or significant indirect benefits. 918 F.3d at 1158. Those benefits need not be monetary. *See id.*

"workspace, clerical support, publicity, . . . reimbursement for out-of-pocket- expenses[,]" and "networking opportunities." 286 F.3d at 124. The Second Circuit found that these benefits were "merely a necessary incident" to the plaintiff's volunteer work. *Id.* at 126. These incidental benefits were unlike the job-related benefits given to the volunteer firefighters in *Haavistola* or the cash payments and other expenses given to the welfare recipients in *United States v. New York*, both of which "bear a resemblance to traditional forms of compensation for employees because they include presently vested benefits with real financial value given as consideration for an ongoing relationship and continued service." *Marie v. Am. Red Cross*, 771 F.3d 344, 355 (6th Cir. 2014) (citing *York*, 286 F.3d at 126). While the benefits in this case pose a closer question, particularly the free site/utilities—a jury may find that they were "but a form of compensation for performing a service for the [BLM]." *See Daggitt v. United Food & Commercial Workers Int'l Union, Local 304A*, 245 F.3d 981, 987–88 (8th Cir. 2001) (upholding a finding that "volunteer" union stewards were employees, where they received reimbursement of union dues; taxed reimbursement for "lost time"; and "an employer contribution into the 401(k) plan . . . in an amount equal to the contribution lost by each steward by reason of attending to union affairs during work hours"). Zinke argues that the Bittermanns' benefits were merely incidental to their work as campground hosts, but the Court cannot make that finding as a matter of law. *See*, *e.g.*, *Holder v. Town of Bristol*, No. 3:09-CV-32PPS, 2009 WL 3004552, at *3 (N.D. Ind. Sept. 17, 2009) ("In the modern economy, people are compensated for work in many non-traditional ways. So remuneration can be direct or indirect and need not take the form of salary or wages.")

      This finding is buttressed by the Bittermanns' disputed allegations that Roch promised them future employment, as well as the evidence they produced that a number of other volunteers had become paid employees. As the Bittermanns point out, the United States Equal Employment

11

Opportunity Commission's (EEOC) compliance manual suggests that volunteers may be protected under federal employment statutes when "volunteer work is required for regular employment or regularly leads to regular employment with the same entity." EEOC Compliance Manual § 2-III(A)(1)(c) (citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 198 n.4 (3d Cir. 1994)).

Ultimately, the Court finds that there is a genuine issue of fact on whether the Bittermanns received remuneration sufficient to establish an employment relationship. Accordingly, the Court will deny summary judgment on this issue.

      **B.    A genuine dispute of fact exists regarding whether the Bittermanns had notice of the EEOC administrative time limits.**

Zinke next argues that the Bittermanns have failed to exhaust several of their claims. (Doc. 52 at 14.) "The regulations governing complaints of employment discrimination against federal agencies require that prior to filing a formal complaint, an aggrieved person must file an informal complaint with the EEO counselor of the employer agency within [45] days of the alleged act of discrimination . . . ." See *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1323 (10th Cir. 2002) (citing 29 C.F.R. § 1614.105(a)(1) (2001)). Meda initiated contact with the EEO on September 21, 2017, and Doru on November 14, 2017. Zinke argues that under § 1614.105(a)(1), Meda has not exhausted any claims arising more than 45 days prior to September 21, 2017 (those pre-dating August 7), and Doru has failed to exhaust any claims arising more than 45 days prior to November 14, 2017 (those pre-dating September 30). (Doc. 52 at 15–16.)

The 45-day bar, however, "is to be extended under certain circumstances." *Sizova*, 282 F.3d at 1325.

> The agency or the Commission **shall extend** the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by

> circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2) (emphasis added). The Bittermanns argue that the EEO "agency or Commission decided to extend the time limit by dealing with these issues on the merits." (Doc. 54 at 17 (citing Docs. 52-F; 52-G).) This is incorrect. The agency dismissed the claims because the Bittermanns were classified as volunteers and "lack[ed] standing to file a complaint under the EEOC's regulations . . . ." (*See* Docs. 52-F at 2; 52-G at 2.) Thus, it did not explicitly find that the Bittermanns were entitled to equitable tolling, nor did it make any findings on their claims on the merits.[7] The Court will examine this issue in the first instance.

The 45-day time limit "may be tolled in appropriate circumstances." *Sizova*, 282 F.3d at 1325. The Bittermanns assert that they "did not get orientation or training on EEO discrimination issues, were provided no EEO documents[,] and were not told whom to report discrimination." (Doc. 54 at 17.) They argue that this presents "a fact issue on whether [they] were not notified of the time limits to initiate contact with a Counselor." (*Id.* (citing 29 C.F.R. § 1614.105(a)(2)).)

Zinke asserts for the first time in his reply brief that Meda testified that it is "general knowledge" that "you should report [harassment or discrimination] matters to supervisory employees or to management . . . ." (Doc. 59 at 13 (quoting Doc. 52-A at 22:4–11).) Meda testified that she had previously sued the Brooklyn Law School and thus knew "you cannot be discriminated against on the basis of being pregnant . . . [o]r being an expectant mother . . . ." (Doc. 52-A at 22:12–20.) Similarly, Zinke argues that Doru "testified that in his prior jobs, his employers

---

[7] The Bittermanns contend that the agency "waived the assertion of untimeliness" (Doc. 54 at 17), but they cite no authority in support. The Seventh Circuit has held that waiver only occurs where the "agency decides the merits of a complaint, without addressing the question of timeliness . . . ." *Ester v. Principi*, 250 F.3d 1068, 1071–72 (7th Cir. 2001) (citation omitted). While the Tenth Circuit has not spoken to this issue, the Court finds *Ester* persuasive and declines to find waiver under these circumstances.

13

informed him that any form of workplace discrimination is illegal and that he had the right to bring any allegations of discrimination to the attention of his supervisors or managers[,]" thus he was aware of the 45-day time limit. (Doc. 59 at 13 (citing Doc. 59-J at 18:20–20:19).) But Zinke did not specifically dispute the Bittermanns' factual contention that they received no training on EEO discrimination issues or on how to report discrimination from the BLM. (*See* Docs. 54 at 5 ¶ 3 (citing Docs. 54-2 at 38:19–39:4; 54-3 at 13:14–14:2); 59 at 6; 52-C at 13:4–19 (Roch testimony that BLM volunteers do not receive orientation or training on discrimination or EEO issues)).) And there is no evidence to show that Meda's lawsuit against Brooklyn Law School arose under Title VII, or that Doru's previous employers gave him notice of relevant timeliness requirements.

In *Sizova*, the plaintiff "had received a fellowship administered by [the] defendants and alleged that she was the victim of gender and pregnancy discrimination when the fellowship was terminated." 282 F.3d at 1322. The defendants argued that her complaint should be dismissed for failure to comply with the 45-day deadline. *Id.* at 1326. The plaintiff presented evidence, however, that the defendant "had never given her notice of her [EEO] rights or told her that she was a[n] employee." *Id.* at 1326. The Tenth Circuit found that the EEO posters the defendant displayed did not state that a failure to contact an EEO counselor in 45 days would "result in the loss of a claimant's ability to pursue relief." *Id.* at 1327. More critically to this case, the posters did not give any notice that they applied to "holders of fellowships"—they were only "directed to persons 'on the job . . . .'" *Id.* Thus, the Tenth Circuit found that "it cannot be held as a matter of law that posters directed to . . . employees gave [plaintiff], a . . . fellow, the requisite notice." *Id.* (citing *Johnson v. Runyon*, 47 F.3d 911, 917–19 (7th Cir. 1995) (mere posting of notices not determinative; issue is whether poster reasonably geared to give particular claimant notice of time

14

requirements))). "The 45 day statute of limitations is not reasonable if agencies and courts do not liberally construe the (a)(2) exceptions." *Id.* (brackets and quotation omitted).

Here, it is undisputed that the Bittermanns never received EEO training from the BLM, and their deposition testimony does not establish that they were aware of Title VII's 45-day reporting deadline. *See Sizova*, 282 F.3d at 1327. Thus, an issue of fact remains on the question of whether the Bittermanns had sufficient notice of the 45-day time limit, and the Court must deny Zinke's motion on this issue.

### C. The Court denies Zinke's motion regarding Meda's sexual harassment claim.

Title VII prohibits sexual harassment arising from a hostile work environment. *See* 42 U.S.C. § 2000e-2(a)(1); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir. 2005).

> To establish a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Dick*, 397 F.3d at 1262–63 (quotation and brackets omitted). Zinke bases his argument here entirely on Meda's "exhausted" claims and discusses the single incident that post-dates August 7, 2017 (i.e., that occurred within the 45-day window of her formal complaint): the September 2, 2017 incident when Weinstock yelled at Meda for speeding.[8] (Docs. 52 at 18–21; 59 at 14–15.) He argues that this single incident cannot be severe or pervasive, and that it did not alter the terms of Meda's volunteer position. (Docs. 52 at 20; 59 at 14–15.) He did not argue, in the alternative,

---

[8] Zinke also references the claims in Meda's EEO complaint that Roch took no action after she reported the harassment to him on September 5, and that she was terminated on September 13. (Doc. 52 at 20.) Meda includes these claims, however, as well as the speeding incident, in her discussion of retaliation, not sexual harassment, and the Court will do the same. (*See* Doc. 54 at 21–23.)

15

that Meda cannot demonstrate a hostile work environment if the Court considers Weinstock's June 2017 conduct (i.e., that he complimented her "form-fitting" clothes; told her sexually-related jokes; gave her hugs that were too long and unwelcome; sought time alone with her; invited her to accompany him on rafting trips or out for drinks; created individual training sessions with her; encouraged her to "bend over more often"; stood close to her and peered down her blouse; stood in the doorway to block her exit; and touched her buttocks). The Court declines to make that argument for him and will thus deny his motion with respect to Meda's sexual harassment claim.

### D. The Bittermanns' retaliation claims

Retaliation claims are subject to "the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)," under which "the plaintiff bears the initial burden of establishing a prima facie case of [retaliation], whereupon the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge, and then back to the plaintiff to show that the stated reason is pretextual." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201, 122 (10th Cir. 2006). To establish a case for retaliation under Title VII, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination[;] (2) that a reasonable employee would have found the challenged action materially adverse[;] and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* at 1202 (citations omitted).

#### 1. Meda's retaliation claim involving Weinstock

Meda alleges that she engaged in protected activity in July 2017 by asking Weinstock to stop his harassing conduct. (Doc. 54 at 21.) She asserts that Weinstock's subsequent conduct, which "created an intimidating, discriminatory, hostile, abusive, pervasive and offensive work environment[,]" constituted the requisite adverse employment action. (*See id.* at 22.) A "materially

16

adverse" action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks and citation omitted). A retaliatory hostile work environment may constitute a materially adverse action, but the offending conduct "must render 'the workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). Meda alleges that Weinstock created a retaliatory hostile environment generally by fabricating reasons she was not a good employee, criticizing how she answered the phone, and making fun of her accent. She also relates two specific incidents about Weinstock yelling at her for speeding and breaking a tail light. Finally, Meda asserts that Weinstock's retaliatory behavior began shortly after she asked him to stop sexually harassing her.

The only prong Zinke discusses in his reply brief is the first—he contends that "there is no evidence that [Meda] met with Mr. Weinstock in July 2017 to confront him about his alleged sexual harassment . . . ." (Doc. 59 at 16.) But Meda's testimony provides evidence sufficient to create an issue of fact, and the Court accepts Meda's version for purposes of this motion. As Zinke does not argue that Meda fails to establish the remaining prongs of her claim, the Court will deny the motion on this issue.

### 2. The Bittermanns' retaliation claim

Finally, the Bittermanns easily demonstrate a prima facie case of retaliation based on their termination. They assert that Meda engaged in a protected activity by disclosing Weinstock's

conduct to Roch around September 5, 2017.[9] The materially adverse employment action was, of course, the termination of their VSAs on September 13. And "[t]he close temporal proximity between [Meda's disclosure] and the termination—just [eight] days—is sufficient to allow an inference that a causal connection existed between" the two. *See Argo*, 452 F.3d at 1202 (citation omitted).

"The burden therefore shifts to [Zinke] to articulate a legitimate, nondiscriminatory reason for the discharge." *Id.* He argues that the BLM terminated the Bittermanns' VSAs because of complaints they had received about the Bittermanns: that Meda declined to help two campers who had been threatened; that the campground showers/restrooms were not clean; that Meda arrived late for her visitor center shifts; that Doru's campground upkeep was always below average; and that Doru took two weeks to remove a personal item from an equipment building. As the burden here "is one of production, not persuasion[, and] 'can involve no credibility assessment[,]'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 509, 509 (1993)), the Court finds that Zinke has met the burden to articulate a non-retaliatory reason for the Bittermanns' termination.

Consequently, the burden shifts back to the Bittermanns to show that the BLM's stated reason is pretextual. *Argo*, 452 F.3d at 1201. They argue that "[t]hese circumstances provide a textbook example of the 'cat's paw' or rubber-stamp pretext theory adopted by the Tenth Circuit in *EEOC v. BCI Coca-Cola*, 450 F.3d 476, 484 (10th Cir. 2006)." (Doc. 54 at 23.)

> Where, as here, the plaintiff lacks evidence that the actual decisionmaker possessed an unlawful retaliatory animus, the plaintiff can establish pretext by invoking the cat's-paw theory of recovery and presenting evidence that a biased subordinate who lacked decisionmaking power used the formal decisionmaker as a dupe in a deliberate scheme to bring about an adverse employment action. *See BCI Coca–*

---

[9] Zinke argues that Meda never complained about Weinstock's behavior until after she initiated the EEO complaint. (Doc. 52 at 23.) The Court has already found, however, that Meda's testimony creates a genuine dispute of fact about when she disclosed Weinstock's conduct to Roch.

18

>*Cola*, 450 F.3d at 484–85. To survive summary judgment when a retaliation claim is based on the cat's-paw theory, the plaintiff must establish that there is a genuine issue of material fact as to (1) the retaliatory animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action. *See id.* at 488; *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 950 (10th Cir. 2011).

*Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514–15 (10th Cir. 2015). The Bittermanns do very little to flesh out this argument. They state only that "[t]he alleged sexual harasser and the alleged harasser's immediate supervisor were the persons . . . [whose] reports to their superiors led to [the Bittermanns'] terminations." (Doc. 54 at 23.)

In *Thomas*, the plaintiff attempted to show retaliatory animus by demonstrating that: (1) a report the supervisor had made was false; and (2) that there were "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the report. 803 F.3d at 515. But here, the Bittermanns make no effort to argue that Weinstock or Roch had a retaliatory animus. Assuming they are again relying on the temporal proximity from Meda's conversations with both men to the actions they took thereafter, the Tenth Circuit has stated "that close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) (citing *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000)). The Bittermanns have simply not developed their arguments on this point.

They also fail to develop any argument on the second prong—whether the animus of either Weinstock or Roch caused the decisionmaker (here Roch, Bailey, and Schlanger) to terminate the VSAs. As the Bittermanns failed to carry their burden to establish pretext under this or any other theory, the Court must find for Defendant on this issue.

**THEREFORE,**

**IT IS ORDERED** that Zinke's Motion for Summary Judgment and Memorandum of Law in Support (Doc. 52) is **GRANTED IN PART** and the Bittermanns' claim for retaliation based on their termination is dismissed;

**IT IS FURTHER ORDERED** that the remainder of Zinke's motion is **DENIED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE